STARBUCK, The G. H. See Case No. 5,-378.

STARIN, The C. F. See Case No. 2.565.
STARIN, The J. H. See Case No. 7,320.

STARIN, The JOHN H. See Case No. 7,351.
STAR INS. CO. (CHARTER OAK FIRE INS. CO. v.). See Case No. 2.623.
STARK (BACON v.). See Case No. 715.
STARK (FAILING v.). See Case No. 13.317.
STARK (GRAHAM v.). See Case No. 5.676.
STARK (KAMM v.). See Case No. 7,604.

## Case No. 13,307.

### STARK v. STARR.

[1 Sawy. 15.] [1]

Circuit Court, D. Oregon. Feb. 8, 1870.

EJECTMENT — EQUITABLE DEFENSE — TOWN SITE ACT—COLOR OF TITLE—POSSESSION —IMPROVEMENTS.

1. An equitable title is no defense to an action for possession by the holder of the legal title.

2. The act of May 23. 1844 .(5 Stat. 657), commonly called the "Town Site Act," was not in force in Oregon prior to July 17, 1854.

3. The Oregon Code (Gen. Laws 1845–64. p. 226) does not allow a defendant in ejectment to defeat the plaintiff, by giving in evidence any estate in himself or another in the property in controversy, unless the same be pleaded in his answer.

4. Color of title is only the appearance of title. and therefore it matters not whether the grantor in a deed had any title or not, if it appears from the face of such deed. when compared with the law regulating the subject, that he might have had title, his formal conveyance gives color of title to possession, taken or held under it.

[Cited in Re Ah Lee. 5 Fed. 913; McConnaughy v. Wiley, 33 Fed. 454.]

5. Possession is presumed to be rightful until the contrary appears. and therefore adverse to the title of any other claimant; and this rule extends to the case of a vendee as against his vendor after the performance of the conditions of purchase by the former.

6. A person in possession under color of title, who believes. and has good reason to believe that his title is good, is acting in good faith, so as to entitle him to set off the value of improvements made by him upon the property, against a claim for mesne profits.

[Cited in Hicklin v. Marco, 46 Fed. 425.]

7. A person in possession under color of title, who makes permanent improvements upon the property. is presumed to be acting in good faith until the contrary appears.

8. A permanent improvement is something done or put upon the land by the occupant which he cannot remove. either because it has become physically impossible to separate it from the land, or, in contemplation of law, it has been annexed to the soil and become a part of the freehold.

9. To entitle a defendant in an action for mesne profits to set off the value of the improvements made upon the land against such profits. they must not only be permanent, but they must add to the future value of the property for the ordinary purposes for which it is or may be used.

10. A street improvement is not an improvement made on the property, upon which the assessment was made for such improvement,

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

and therefore the value of it cannot be set off by the occupant against a claim for mesne profits.

11. It is the duty of a party in possession of property, claiming title or interest therein, to pay the taxes and charges imposed thereon, and therefore an assessment for street improvement paid by a defendant in an action for mesne profits, is a proper deduction from the gross value of the rents of the property, in estimating the actual damage which the plaintiff has sustained, by the defendant's withholding of the possession.

[Cited in Neff v. Pennoyer, Case No. 10,-085.]

On December 21, 1868, the plaintiff, Stark, commenced separate actions against six persons, then in possession of different portions of the premises in controversy. On May 3, 1869, the defendants in these several actions answered, disclaiming any interest in the property, and alleging that they were in possession simply as the tenants of the defendant, Starr. On the same day Starr appeared, and was made defendant in place of the tenants. Code Or. (Gen. Laws 1845-64, p. 226). Thereupon, in pursuance of the stipulation of the parties, an order was made consolidating the actions and allowing the parties to plead anew, and proceed as if the action had been originally commenced against Starr for the whole premises. On May 11, the defendant answered the complaint in the consolidated action, whereby he denied each material allegation thereof, except those in relation to the citizenship of the parties and the value of the premises; and also alleged that he had an "equitable title" to the premises, and was entitled to the possession thereof. On June 14, on motion of plaintiff, the last mentioned allegation was stricken from the answer as "immaterial and frivolous," for the reas_n that an equitable title or interest in land is no defense to an action for possession by the holder of the legal title. On August 4, and days following, in pursuance of the stipulation of the parties, the cause was tried by the court without the intervention of a jury.

William Strong and Lansing Stout, for plaintiff.

David Logan and W. W. Chapman, for defendant.

DEADY, District Judge. The complaint alleges that the plaintiff is a citizen of Connecticut, and the defendant a citizen of Oregon, and that the premises in controversy exceed in value the sum of five hundred dollars; that the plaintiff is and for more than six years has been the owner and entitled to the immediate possession of lots one and two and the north half of lot four in block eighty-one in the city of Portland; and that the defendant wrongfully withholds from the plaintiff the possession of said premises and has so withheld such possession for the period of six years, to his damage $30,000.

On the trial plaintiff gave in evidence a patent from the United States to himself, dated December 8, 1860, to a certain tract of land, in the city of Portland, including the premises in controversy. The defendant offered evidence to show that the premises were a part of a tract of land called the town of Portland, which had been laid off in lots and blocks since 1850, and upon which trade and commerce had been carried on more or less ever since. This evidence was offered to show title to the premises in the defendant as an occupant thereof under the act of congress of May 23, 1844 (5 Stat. 657), commonly called the "Town Site Act." Being objected to, it was excluded, because the town site act was not in force in Oregon prior to its extension here by the act of July 17, 1854 (10 Stat. 305). And as it appeared from the patent to the plaintiff that he was a "settler" upon the land under the act of congress of Sept. 27, 1850 (9 Stat. 497), commonly called the "Donation Act," prior to the passage of the act of July 17, 1854, his right under the first act could not be divested by the second one. Lownsdale v. Portland [Case No. 8,578]; Stark v. Starr, 6 Wall. [73 U. S.] 413.

Again, this evidence was not admissible because no such defense or right was pleaded by the defendant. The Code does not allow a defendant in ejectment, to defeat the plaintiff by giving "in evidence any estate in himself or another in the property, * * unless the same be pleaded in his answer." Code Or. (Gen. Laws 1845-64, p. 226).

Except this, the defendant offered no evidence to show title in himself or to impeach or deny that of the plaintiff. The legal title, therefore, being in the plaintiff, he has a present right to the possession and must have judgment accordingly. Indeed, this conclusion was practically admitted on the trial by the counsel for the defendant.

The defendant then offered evidence to show that he had improved the property for the purpose of setting off the present value of such improvements against the claim of the plaintiff for damages for withholding the possession of the same.

The Code provides that in ejectment, the plaintiff may, in the same action, recover damages for withholding the possession for the term of six years prior to the commencement of the action and to the time of giving a verdict therein, exclusive of the use of permanent improvements made by defendant; and also, that, "when permanent improvements have been made upon the property by the defendant, or those under whom he claims, holding under color of title adversely to the claim of the plaintiff, in good faith, the value thereof at the time of trial shall be allowed as a set-off against such damages." Code Or. (Gen. Laws 1845-64, pp. 226, 227).

Objection was made to the evidence concerning improvements because the supposed set-off was not pleaded in the answer. The objection was sustained, but the defendant had leave to then file an amended answer, in which it is alleged, that he and "those under whom he claims have been and now are hold-

ing under color of title adversely to the plaintiff in good faith," and that while so holding they made permanent improvements upon the premises, of the present value of $12,312, which sum, or so much thereof as may be necessary, the defendant will set off against the damages to which the plaintiff may be entitled for the use and occupation of the premises. To this amended answer the plaintiff filed a replication, denying specifically each allegation thereof, except the one in relation to the present value of the improvements, and as to this, it alleged that the value of the improvements upon lots one and two was not more than $3,080, and that there were no permanent improvements of any present value on the north half of lot four.

The evidence offered by the defendant was then heard and received, and the case argued and submitted.

In the consideration of the case the following questions arise:

(1) What damages is the plaintiff entitled to for the wrongful withholding of the premises by the defendant?

(2) Did the defendant or those under whom he claims make permanent improvements upon the property, while holding under color of title adversely to the claim of the plaintiff, in good faith; and

(3) If so, what is the present value of such improvements?

The measure of damages for withholding the possession of the premises is the value of the use and occupation of the same, exclusive of the use of permanent improvements made by defendant.

There is no direct testimony as to whether or not all the improvements upon the premises were made by the defendant or those under whom he claims, but such is the reasonable inference. The possession of the defendant and his vendors extends back to 1850, except as to lot one, and that is shown to have commenced not later than 1857. It is also quite probable from the testimony that all the improvements which the defendant seeks to set off against the plaintiff's claim for damages were made by the defendant while sole occupant of the premises, or by him and his brother, A. M. Starr, while occupying them or some portion of them as tenants in common. Indeed, I did not understand that the contrary was asserted or claimed on the trial by counsel for the plaintiff. For the purpose of this inquiry, I think that these improvements, whether made by the defendant as sole occupant or by him and his co-tenant, ought to be considered as made by the defendant.

There is no material conflict or difference in the testimony as to the probable value of the use and occupation of the lots during the six years prior to the commencement of the action and since.

Upon this point, W. S. Ladd, called by the plaintiff, testified that from $22 to $25 per month was a reasonable ground rent for each lot of 50 by 100 feet. The defendant, being called as a witness, for himself, testified that such rent was from $24 to $30. The mean between these is $25¼. Omitting the fraction, this gives for the 2½ lots, the sum of $750 per annum, and $4,500 for the six years. Add to this the thirteen months which have elapsed since the commencement of the action—December 21, 1868—and we have the sum of $5,312½.

Has the defendant shown himself entitled to a set-off for improvements, as set up in his answer? The first inquiry upon this point is, was the defendant holding under color of title when he made these improvements? Color of title is not title but only the appearance of title. "Any instrument having a grantor and grantee and containing a description of the lands intended to be conveyed, and apt words for their conveyance, gives color of title to the lands described." 3 Washb. Real Prop. 139; Moore v. Brown, 11 How. [52 U. S.] 414. It matters not whether the grantor had any title or not, if from the face of the deed compared with the law regulating the subject, he might have had title, his formal conveyance gives color of title to possession taken under it.

Judged by this rule, the possession of the premises has been held under color of title by the defendant and his vendors since the fall of 1850, except lot one, and that has been so held at least since 1857. The facts in regard to the conveyances of the premises appear from the evidence to be as follows:

(1) Lot one.—July 24, 1852, deed from sheriff of county to Barnhart, and made in pursuance of sale on execution to enforce judgment of Norton v. Winter [1 Or. 42, 97], but with this deed the defendant fails to connect himself. September 22, 1857, deed from Eastman to Hutchins and Hale. May 19, 1858, deed from Hutchins and Hale to A. M. and L. M. Starr, the defendant, for the north half. May 20, 1858, deed from Hale to Hutchins for the south half. July 15, 1859, deed from Hutchins to A. M. Starr and Ankeny for the south half. July 25, 1860, deed from Ankeny to L. M. Starr for interest in south half. September 18, 1865, deed from A. M. Starr to L. M. Starr for interest in whole lot. From this statement it appears that the defendant and those under whom he claims have had color of title to lot one since September 22, 1857, and that the defendant as the co-tenant of his brother, A. M. Starr, has had color of title to the north half of said lot since May 19, 1858, and to the south half since July 20, 1860, and to the whole lot as sole tenant since September 18, 1865.

(2) Lot two.—October 3, 1850, deed from Chapman to defendant for the south half. October 9, 1850, deed from Butler to McCay for the north half. September 16, 1851, deed from Marye to McCay for the north half. September 22, 1851, deed from McCay to A. M. Starr for the north half. Jan-

uary 4, 1864, deed from defendant to A. M. Starr for undivided half of south half. January 4, 1864, deed from A. M. Starr to defendant for undivided half of north half. September 18, 1865, deed from A. M. Starr to defendant for his interest in whole lot. This statement shows that the defendant has had color of title to the south half of lot two since October 3, 1850, and that he and those under whom he claims have had color of title to the north half since October 9, 1850, and that as the co-tenant of A. M. Starr, he had color of title to the whole lot from January 4, 1864, to September 18, 1865, and has had such color as sole tenant since the last mentioned date.

(3) Lot four.—November 11, 1850, deed from Chapman to Powell. August 12, 1856, deed from Powell to A. M. Starr and defendant. September 18, 1865, deed from A. M. Starr to defendant for the north half.

From this it appears that the defendant and those under whom he claims have had color of title to the north half of lot four since November 11, 1850, and that the defendant, as co-tenant with A. M. Starr, has had color of title to said north half since August 12, 1856, and as sole tenant since September 18, 1865.

As to the possession alleged to be held under this color of title, there is no direct proof except as to that of the defendant and A. M. Starr. As to their vendors it might be inferred that they had the actual occupation of the premises described in their several deeds, and certainly nothing appears to the contrary. But as the supposed improvements have been made since the premises are alleged to have been in the possession of the defendant and A. M. Starr, the inquiry as to the possession or good faith of their vendors or predecessors is not material.

The evidence satisfies my mind that the defendant has been in the possession of the premises, except the north half of lot two, either as tenant in common with A. M. Starr or as sole tenant, since July 25, 1860, and as tenant in common of north half of lot two with A. M. Starr since January, 1864, and that the latter had been in possession of the same prior to that time as far back as 1851.

The possession of the Starrs was taken in pursuance of their deeds. They did not enter under the plaintiff or hold under him. It was open and visible and actually with the knowledge of the plaintiff. They were aware of his patent, and also of his claim to be a settler upon a tract of land including the premises, under the donation act, but their deeds and possession were prior in point of time to the patent. After the issue of the patent, and probably before, they knew that the plaintiff had the legal title to a tract of land including the premises, but believed that he was bound to convey such title to them and would be estopped to assert it against them: and the evidence

tends to show that about the date of the patent the plaintiff declared to them that he would convey them such legal title for a mere nominal consideration, but whether as a matter of favor or legal obligation does not appear. It also appears that since 1862 the Starrs expended $5,000 or $6,000 in improvements upon the property, and were in the regular receipt of the rents and profits of the same; and that about 1864 they brought a suit against the plaintiff concerning their title, in which they failed to obtain any relief. That in 1864 the plaintiff said to the defendant, that Chapman never paid him for the property, but that if he, Chapman, would pay him, he, the plaintiff, would make the defendant a deed.

For some reason, neither party has seen proper to show how property, apparently within the donation claim of the plaintiff, should have been sold and conveyed as far back as 1850, by persons having no apparent relations with the plaintiff or connection with the legal title.

The circumstances referred to in the remarks of the plaintiff to the defendant in 1864, indicate that at some time Chapman and himself had come to an understanding or agreement, by which the plaintiff was to make a deed to this property in favor of the defendant or those under whom he claimed, and that the plaintiff excused his failure to perform on the ground that Chapman had not paid him for the property. It also indicates that lots one and the north half of two were originally sold by Chapman, as well as lots four and the south half of two.

These are all the material circumstances proven in the case, which bear upon the character of the defendant's possession, and they are all drawn from the testimony of the defendant himself, and A. M. Starr. Was this a "holding under color of title adversely to the claim of the plaintiff," or in other words, was the possession of the Starrs adverse to the title or right of the plaintiff?

What constitutes adverse possession has been one of the vexed questions of the law. In some cases the practical effect of the ruling of the courts has been to require actual proof that the possession of the occupant was adverse, even when nothing appeared to the contrary, or to presume that his possession was in subservience to the legal owner because the contrary did not affirmatively appear.

But the just and reasonable rule seems to be, that every possession is presumed to be rightful and therefore adverse to the title of any other claimant. This presumption may be overcome by the proof of facts inconsistent with it, as by showing that the occupant received a lease; paid rent; or acknowledged the superiority of the title set up.

In Parker v. Proprietors, etc., 3 Metc. [Mass.] 99, the court say: "If a person enters on land, having no right or title, and maintains the exclusive possession, taking the rents and

profits. his possession would be considered adverse, and, if of sufficient notoriety. would amount to a disseizin." Here the unexplained fact of possession and receipt of rents and profits is held to constitute an adverse possession; and for the simple reason it must be that the law presumes every possession rightful until the contrary appears or is shown.

In La Frombois v. Jackson, 8 Cow. 618, Senator Viele says: "Every possession, then. is adverse, and entitled to the peaceful and benignant operation and protecting safeguard of the statute, which is not in subservience to the title of another, either by a direct acknowledgment of some kind, or an open or tacit disavowal of right on the part of the occupant; and it is in the latter case only, that the law adjudges the possession of one to the benefit of another."

In Smith v. Lorillard, 10 Johns. 356, Kent, C. J., says: "Possession is always presumption of right, and it stands good until other and stronger evidence destroys that presumption."

Tried by this rule the possession of the defendant and A. M. Starr, must be considered adverse to the title of the plaintiff. They were in the actual and exclusive possession and receipt of the rents and profits. They did not enter under the plaintiff, but so far as appears without any recognition of his title.

But it is also true, that in the course of their possession, the Starrs acknowledged the legal title to be in the plaintiff—the final confirmation of his right as a settler under the donation act, by the issue of a patent to him by the United States. But this acknowledgment was always coupled with the opinion and assertion upon their part, that the plaintiff had no beneficial interest in the property, and, in some way. was bound in equity, and good conscience to convey such title to them.

Upon this aspect of the case, the learned counsel for the plaintiff insist. that since 1860, and prior to the making of any of the supposed improvements, the possession of the Starrs must be considered as being held in subservience to the title of the plaintiff, because during this time they acknowledged it and claimed to be entitled to it, and therefore their possession could not be adverse to it. In support of this argument, counsel cited the well-known rule that the possession of the vendee under the contract of purchase is not deemed adverse to the title of the vendor.

But admitting for the sake of the argument, the proper conclusion from the facts in the case to be, that the relation of vendor and vendee existed between the plaintiff and the Starrs—that the latter entered under a mere purchase of the possession, acknowledging the title of the former as paramount, but claiming for any reason to be entitled to have such title conveyed to themselves, it would not follow that their possession was not adverse.

After performance by the vendee of the conditions.of sale. as the payment of the purchase money, and when in equity he would be entitled to have a conveyance of the title, his possession may become adverse to the title of the vendor, and in the absence of any proof to the contrary, should be presumed to be so. La Frambois v. Jackson, supra.

In Briggs v. Prosser, 14 Wend. 228, Nelson J., it is stated, "There can be no doubt that a person entering upon land under a contract of purchase, unperformed on his part, does not hold possession adversely to the vendor. After performance, and an equitable title to a deed of the premises acquired, I perceive no reason why his possession may not become adverse, or, in other words, there is nothing in the character of it inconsistent with the idea of an adverse possession. Whether it were in fact adverse or not, would depend upon the circumstances of each particular case."

This leads to the consideration of the point as to whether the Starrs were acting in good faith or not. To entitle the occupant to set off the value of his supposed improvements against the plaintiff's claim for mesne profits (damages), they must have been made while the occupant was "holding under color of title, adversely to the claim of the plaintiff," and "in good faith." To enable the defendant to claim the benefit of the law giving the set-off, these three things must concur. He must have held possession under color of title; his possession must have been adverse to the title of the plaintiff; and he must have acted in good faith.

Good faith, in relation to the colorable title, must mean nothing more nor less than that the party honestly believed his title good, although, upon investigation, it proves otherwise. Of course, in determining whether a party did so believe or not, weight must be given to the particular circumstances of the case. For. although the occupant hold under color of title, yet. if at the same time he knows. or has good reason to believe that his title is merely colorable. and confers no right as against the legal owner, he is not acting in good faith. If, under such circumstances he makes improvements. he does so at his peril. and cannot compel the true owner to allow him for them. If, then, the occupant honestly believes his title valid, however defective or unreal it may prove to be, he is holding in good faith. The good faith required by the code, is an actual belief in the apparent title under which the occupant holds and improves.

Upon whom is the burden of proof in this matter? Good faith is the opposite to bad faith, and bad faith and fraud are synonymous. Fraud is never presumed, except when the law peremptorily so declares, but must be proven. It would seem. therefore, that the occupant in this particular as in general is presumed to have acted in good faith until the contrary appears.

No evidence has been produced by the plaintiff to show that the Starrs were acting in bad faith. Nothing in the circumstances of the case tends to support that conclusion. On the contrary, the very fact that they expended several thousand dollars in making improvements on the land is evidence of their good faith—a faith which manifested itself by its works. My conclusion upon this branch of the case is, that the Starrs were "holding under color of title adversely to the claim of plaintiff, in good faith."

Next, while so holding did they or either of them make permanent improvements upon the premises? At common law when the owner of an estate, who had been disseized, sought to recover damages for the loss of the profits during the ouster against the wrongful occupant thereof, the latter might recoup such damages to the extent of the value of permanently useful improvements put upon the land by himself. And this was so, whether the remedy pursued was assize of novel disseizin, trespass with continuando brought after entry or after recovery in ejectment. Gill v. Patten [Case No. 5,428]; Green v. Biddle, 8 Wheat. [21 U. S.] 81, 82. In Jackson v. Loomis, 4 Cow. 172, it was held in an action of trespass for mesne profits, that a bona fide occupant should be allowed the value of his improvements made in good faith to the extent of the rents and profits claimed. See, also, Bright v. Boyd [Case No. 1,875].

The provision in the Code concerning permanent improvements is a substantial affirmance of this common law rule, restricted in all cases to the case of a bona fide possessor holding under color of title. Interpreting the phrase "permanent improvements" by the common law, it must be construed to mean something done to or put upon the land which the occupant cannot remove or carry away with him, either because it has become physically impossible to separate it from the land, or because in contemplation of law it has been annexed to the soil and is therefore to be considered a part of the freehold. Such an improvement, if it exist at the time of trial, is a permanent one. The term is a relative one and does not import any particular length of time. The degree of permanency or probable duration of the improvement is only material in estimating its value. Whatever the occupant may remove when ejected from the premises, is not a permanent improvement, and, therefore, there is no reason that he should be allowed for it out of the claim for rents and profits.

But the thing done to or upon the land must also as the word imports be an improvement to it—it must meliorate—better the condition of the property. It must make it more valuable in the future for the ordinary purposes for which such property is owned and used. Therefore a structure or labor may be as permanent in every sense of the word as the pyramid of Cheops, and yet add nothing

to the usefulness or value of the land for ordinary purposes. It does not make the land more beneficial to the true owner, and is not an improvement. Bright v. Boyd [supra].

With this understanding of the phrase "permanent improvements," let us see what is the character and value of the alleged improvements in this case.

Burton and Goodenough, two master mechanics, called by the plaintiff, testified that they had examined the property during the trial. Their testimony substantially agrees, and is to the effect—that there are on lots one and two, three new wooden buildings, and an old shop connected with a marble yard, and on the north half of lot four there is an old wooden house, and that the present value of the new buildings is $350 each, of the shop $100, and the old wooden house $400. That there is a stone wall built across lots one and two on the east end, fronting on the Wallamet river, which would now cost $3,025, and that in their judgment the buildings are not permanent improvements, but the wall is. The defendant testified that either he or he and A. M. Starr caused the wall and buildings to be put upon the premises—the former in 1863 and the latter since. He also testified that the three new buildings were worth $1,200, and that the buildings on north half of lot four were worth $1,800 or $2,000. On cross-examination stated he could not say that the three buildings were worth $1,200 now. The defendant also testified that the stone wall was built as a part foundation of a house and to protect the bank from the river, but that he had abandoned the building of the house on account of the litigation concerning the premises with the plaintiff in 1864–5; and that in 1865 he had paid the municipal authorities of Portland the sum of $1,200 or $1,500, which was assessed upon said premises, for the purpose of paving and improving the street in front of them. It appears from the testimony of W. S. Ladd that these buildings, situated as they are, will rent for an average of $20 each per month exclusive of ground rent or the value of the land.

This is the substance of the testimony concerning the nature and value of the supposed improvements. The burden of proof is upon the defendants to show that they are beneficial to the property and to what extent.

This testimony shows beyond a doubt that the buildings—all five of them—are "permanent improvements" within the legal sense of that phrase. The opinion of the witnesses as to their permanency cannot control the judgment of the court upon the facts. As Mr. Burton said himself on cross-examination, "they are permanent as long as they stay there." They are permanent because they are fixtures—things annexed to the soil—and the defendant, being a wrongful occupant of the premises, has no right to take them away if he would. Upon this point the plaintiff's witnesses evidently testified under a misapprehension of the meaning of the term "perma-

ncnt." If they were not permanent in some degree, they would have no value, and yet both these witnesses give them a present value of between $1,400 and $1,600. They also improve the property. They will rent for a certain sum per month and they enhance the present value of the property by that amount. Town lots are ordinarily used for building houses upon, to be rented. These buildings are improvements of that character. Their actual value depends upon how long they will probably endure and be fit for use.

Upon this point the evidence is not uniform. The testimony of the defendant puts the value of the buildings at not less than $3,000; that of Burton at $1,400; that of Goodenough at $1,550, while Mr. Ladd gives them a present rental value of $1,200 per annum. While it is apparent that these buildings enhance the present value of the property, it is difficult in the nature of things, and particularly upon this evidence, to say precisely by how much.

This depends upon the probable durability of the buildings, the cost of keeping them up and the probable future demand for such houses—in other words, what is likely to be the annual net gain to the owner of the property from their future rental and for how long. The future rental of cheap, small wooden buildings is not capable of a very definite estimate. Under these circumstances and state of the proof, I have found the present value of the buildings to be $2,000.

The foundation wall is a permanent structure beyond a question, but I cannot satisfy my mind from the testimony, that it is of any benefit to the owner of property, or enhances its present value in any degree. If a house were built upon it, the result might be beneficial to the property, but to require the owner to build the house to make the wall available, would be in effect controlling him in the future use and enjoyment of his property for the benefit of the occupant. Practically the house would be the improvement and not the wall alone. But it may be said that the wall alone is a present benefit to the property as a means of protecting the bank from the wash of the river—and I do not overlook the fact that the defendant testified that it was partly built for that purpose. Yet, judging from the indefinite and hesitating manner in which the defendant made that statement, and his definite and positive testimony that the wall was intended as the foundation for a house, which was not built on account of his litigation with the plaintiff, and the further fact, that the defendant has failed to produce any evidence to show that a wall is in any degree or manner necessary to protect the bank from the action of the river, I conclude that it is not. The burden of proof is upon the defendant to show the value or benefit of this wall to the property, and if it was in fact useful as a protection against the water, it was very easy to have shown it by the testimony of persons conversant with the subject.

The amount paid the city of Portland by the occupant as an assessment for the improvement of the street adjoining the premises, is objected to as a set-off by the plaintiff as not being an improvement "made upon the property."

This may be called a technical distinction, but nevertheless, it is a substantial one. The assessment upon the property for the purpose of improving the street was a tax upon it—nothing more nor less. The payment of taxes upon property is not an improvement made upon it, however much such payment may indirectly enhance its value. This item of the alleged set-off is not within either the letter or reason of the provision of the Code concerning "permanent improvements."

But it is a proper deduction to be made from the gross rents of the property in estimating the actual damage which the plaintiff has sustained by the defendant's wrongful withholding of the possession. The expenditure was not made voluntarily by the defendant, but in obedience to the law and for the benefit of the property, and consequently its owner. It is the duty of a party in possession of property, claiming title or interest therein, to pay all lawful taxes and charges imposed thereon by public authority. If he neglect to do this, and purchase the property at a sale for these taxes, he acquires no right thereby, because his conduct is deemed fraudulent as against the true owner. As it turns out, these taxes were paid by the defendant for the benefit of the plaintiff. If the former had not paid them the latter must, or allowed the property to have been sold as delinquent. Therefore in estimating the damages to which the plaintiff is entitled for being kept out of possession, the amount of the assessment must be deducted from the gross rents, and the remainder is the true profits or damages. Bright v. Boyd [supra].

On the contrary, if the payment of a tax by an occupant without title could only be allowed him against a claim for mesne profits, by way of set-off, as for a permanent improvement, it would often happen that it could not be allowed at all. For instance, if the pavement put upon the street by this assessment were now worn out or if from serious defects in plan, materials or workmanship, it had proved worthless, it would not be of any present value to the property and could not be the subject of a set-off. But as the tax was paid and expended in obedience to public authority, the occupant is not responsible for such consequences or results, and therefore his right to be re-imbursed ought not to depend upon them.

In conclusion the plaintiff is entitled to a judgment for the recovery of the possession of the premises.

As has been shown, the use and occupation of the premises, exclusive of defendant's improvements, was worth $5,312.50. Deduct from this the amount—$1,350—of the tax paid for street improvements, and the remainder—$3,962.50—is the mesne profits, or damages, to which the plaintiff is entitled. Against this

amount set off the present value—$2,000—of the permanent improvements, and the remainder—$1,962.50—is the sum which the plaintiff is entitled to recover of the defendant, together with costs and expenses.

[NOTE. Upon the entry of the judgment in this case, Starr filed a bill in equity against Stark, setting up his equitable title to the premises, and praying that Stark be decreed to convey the legal title, and perpetually enjoined from executing his judgment in the above case. The case was first heard before Judge Deady, upon motion for preliminary injunction. The motion was denied, with costs. Case No. 13,316. Upon the final hearing of the case, a decree was entered in favor of the complainant. The opinion in this case was delivered by Circuit Judge Sawyer, Judge Deady dissenting. Id. 13,317. Upon appeal to the supreme court by Stark, this decree was affirmed. Mr. Justice Field delivered the opinion of the court. 94 U. S. 477.]